09-2628-ag
Zhang v. Holder

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: June 24, 2010          Decided: August 12, 2010)

Docket No. 09-2628-ag
_____

XUE YONG ZHANG,

*Petitioner*,

-v.-

ERIC H. HOLDER, JR., Attorney General of the United States,

*Respondent*.

_____

Before:  MINER, CABRANES, and WESLEY, *Circuit Judges*.

Petitioner Xue Yong Zhang seeks review of a May 22, 2009 decision by the Board of Immigration Appeals dismissing his appeal of an Immigration Judge's January 22, 2009 order, which terminated his reopened removal proceedings on the basis that he had already been removed from the United States.  Because we conclude that the BIA is entitled to deference regarding its interpretation of the regulation governing motions to reopen, we hold that the BIA did not err by dismissing petitioner's appeal for want of jurisdiction. We further hold that the *nunc pro tunc* relief sought by petitioner is not warranted on these facts.

PETITION DENIED.

_____

MATTHEW L. GUADAGNO (Jules E. Coven and Kerry W. Bretz, *on the brief*), Bretz & Coven, LLP, New York, NY, *for Petitioner*.

STEVEN F. DAY, Trial Attorney (Tony West, Assistant Attorney General; and Francis W. Fraser, Senior Litigation Counsel, *on the brief*), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, *for Respondent*.

_____

WESLEY, *Circuit Judge*:

Petitioner Xue Yong Zhang ("petitioner" or "Zhang") seeks review of a May 22, 2009 decision by the Board of Immigration Appeals ("BIA" or "Board"), which dismissed his appeal of an Immigration Judge's January 22, 2009 decision for want of jurisdiction. In 2003, the order calling for petitioner to be removed, as well as a finding by the Immigration Judge ("IJ") that petitioner had submitted a frivolous asylum application, became final. Five years later, in July 2008, petitioner filed a motion to reopen those proceedings and a request for a stay of removal. The motion was procedurally defective under the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1229a(c)(7), but petitioner asked the BIA to invoke its "*sua sponte* authority," *see* 8 C.F.R. § 1003.2(a).

The BIA declined to issue the stay, but it later

2

granted the motion to reopen and remanded the proceedings to the IJ. However, by the time the BIA granted the motion, petitioner had already been removed. On remand, the IJ terminated the proceedings when she learned that petitioner was no longer physically present in the United States. In the decision challenged by petitioner here, the BIA vacated its prior order reopening the removal proceedings, reasoning that it lacked jurisdiction to consider petitioner's motion at that time because he had already been removed. In support of that conclusion, the Board cited the "departure bar" regulation, 8 C.F.R. § 1003.2(d), and its decision in *In re Armendarez-Mendez*, 24 I. & N. Dec. 646 (BIA 2008).

In his petition for review, petitioner contends that the departure bar, as applied by the BIA in this case, is invalid because it conflicts with the language of the regulation governing the BIA's *sua sponte* authority. Petitioner also asserts, in the alternative, that the BIA should have granted his motion to reopen, *nunc pro tunc*, as of the date that it denied his request for a stay of removal. This equitable relief, petitioner argues, would have avoided the application of the departure bar.

Although we are sympathetic to petitioner's plight, we

3

are not persuaded, as a legal matter, by either contention. The BIA has taken the position in a precedential decision that the departure bar, where applicable, deprives it of jurisdiction to consider a motion to reopen that asks the Board to invoke its *sua sponte* authority. *See In re Armendarez-Mendez*, 24 I. & N. Dec. at 660. We conclude that the BIA's construction of this regulation is not plainly erroneous and is therefore entitled to deference. Consequently, the BIA did not err in relying on *In re Armendarez-Mendez* and deciding that it lacked jurisdiction to reopen petitioner's removal proceedings after he had been removed from the country.

We decline to resolve, however, whether the departure bar also precludes relief under the doctrine of *nunc pro tunc*. We need not take that additional step because, assuming, *arguendo*, that *nunc pro tunc* relief is not jurisdictionally foreclosed, petitioner is not entitled to that equitable remedy in this case. Accordingly, the petition is denied.

## I. BACKGROUND

Zhang was born in China in 1978 and first came to the United States in October 1999. Because Zhang lacked valid

4

entry documents when he arrived, the agency formerly known as the Immigration and Naturalization Service ("INS")[1] detained him and commenced removal proceedings. Petitioner conceded that he was subject to removal, and subsequently filed an application for withholding of removal, asylum, and relief under the Convention Against Torture. In his application, Zhang expressed "fear that [he would] be fined and sentenced to jail for at least a year" if he returned to China because he "violated the family planning policy and also left the country illegally without an exit permit."

After accepting briefing relating to the applications, IJ Noel Ferris conducted a merits hearing on April 4, 2001 in New York City. Before petitioner began his testimony, the IJ warned him that knowingly filing a frivolous asylum application would lead him to be "barred forever from receiving any benefits under the Immigration and Nationality Act." The IJ also defined in clear terms the meaning of the word "frivolous." Following these warnings, Zhang indicated that he understood the IJ's admonition and that he wished to

---

[1] The INS ceased to exist on March 1, 2003, and its functions were transferred to the Department of Homeland Security ("DHS") pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (Nov. 25, 2002). *See Dobrova v. Holder*, 607 F.3d 297, 299 n.1 (2d Cir. 2010).

proceed with the adjudication of his asylum application.

During his testimony at the merits hearing, petitioner asserted that he left China to escape political persecution based on China's family planning policies. Early in his testimony, the IJ warned petitioner that "vague" answers to questions from his attorney "impair[ed] [his] believability." Petitioner went on to explain that he married a woman in accordance with his cultural traditions, but that when she became pregnant the government informed them that both the marriage and the pregnancy were "illegal." Government officials then forced his wife to have an abortion and imposed a fine on the couple. Petitioner testified that he was incarcerated after he failed to pay the fine, but that he escaped custody and fled to the United States. The only documentary evidence petitioner produced in support of this testimony was a photograph that he described as depicting himself and his wife on their wedding day. The IJ did not allow petitioner to introduce the picture as evidence of the marriage, but she accepted petitioner's testimony describing the photo. Later, during the government's cross-examination of petitioner relating to statements during his credible fear

interview, the IJ made an express finding that his testimony was not "credible, believable or factually accurate."

After petitioner's testimony was complete, the IJ issued an oral decision:

> [N]ot only have I denied your applications[,] I have found your filing is entirely frivolous and therefore you will be barred for life from ever becoming legally resident in this country. . . .
>
> . . . .
>
> I believe the lies you have told to the [c]ourt are material and I believe they were told to the [c]ourt purely to secure an [i]mmigration benefit.

In a decision issued on the same day, the IJ reviewed petitioner's testimony, characterized it as "absurd" and "just plain made . . . up from beginning to end," and concluded that petitioner had submitted "a frivolous application for asylum . . . supported entirely by . . . perjurious testimony." Petitioner filed an appeal, but the BIA affirmed the IJ's decision without an opinion on January 15, 2003. Petitioner did not seek review of that decision in this Court.

On July 15, 2008, Zhang filed a motion with the BIA seeking: (1) a stay of removal; and (2) to reopen his removal proceedings. Petitioner argued that "the BIA should exercise its *sua sponte* jurisdiction" to reopen the removal

7

proceedings, *see* 8 C.F.R. § 1003.2(a), because the IJ's conclusion that his asylum application was frivolous was "invalid" based on the BIA's intervening decision in *In re Y-L-*, 24 I. & N. Dec. 151 (BIA 2007).

The BIA denied petitioner's motion for a stay of removal two days later, on July 17, 2008, based on its conclusion that "there [was] little likelihood that the motion [to reopen would] be granted." Petitioner was removed to China by the Department of Homeland Security ("DHS") on July 22, 2008. On September 10, 2008, apparently unaware of this fact, the BIA relied on its *sua sponte* authority to grant petitioner's motion to reopen. In that decision, the Board indicated that it did "not necessarily disagree with the [IJ's] ultimate finding[]" that petitioner had knowingly submitted a frivolous asylum application, but it remanded for "clarification" based on *In re Y-L-*.

On remand, on January 22, 2009, the IJ terminated the proceedings once she ascertained that petitioner was no longer physically present in the United States. Zhang's counsel appealed to the BIA. Counsel argued that the BIA had previously erred by denying his request for a stay, and that it should have granted his motion to reopen *nunc pro*

8

*tunc* to a date prior to his removal to avoid the application of the departure bar.  He also "preserve[d] for federal review" the argument that the departure bar conflicts with the provisions of the INA relating to motions to reopen.

On May 22, 2009, the BIA dismissed the appeal and vacated its September 10, 2008 order reopening petitioner's removal proceedings, reasoning that it "did not have jurisdiction" to grant that motion because petitioner had already been removed.  In support of its jurisdictional holding, the BIA cited the departure bar, 8 C.F.R. § 1003.2(d), and *In re Armendarez-Mendez*, 24 I. & N. Dec. 646 (BIA 2008).  Following that decision, Zhang's counsel filed the instant petition for review.

## II.  DISCUSSION

This case requires us to consider the scope of the BIA's jurisdiction to reopen otherwise-final removal proceedings in response to a party's motion, where the motion to reopen is deficient under the INA and instead asks the Board to invoke its *sua sponte* authority.  Specifically, we must decide whether the departure bar, 8 C.F.R. § 1003.2(d), divests the BIA of jurisdiction to grant an alien's motion to reopen based on the Board's *sua sponte*

9

authority, *id.* § 1003.2(a), where the movant has already been removed from the country.[2]

In *In re Armendarez-Mendez*, the BIA interpreted 8 C.F.R. § 1003.2 and answered that question in the affirmative. 24 I. & N. Dec. at 653, 660. Although the BIA's construction is not without flaws, we conclude that its view is entitled to deference under the circumstances of

---

[2] Petitioner concedes that he did not advance this contention during his appeal to the BIA. (*See* Pet'r Br. 27 n.5.) However, the government has not raised a failure-to-exhaust defense, thereby waiving it. *See Lin Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 120 (2d Cir. 2007). We may therefore reach the merits of petitioner's argument relating to the relationship between the BIA's *sua sponte* authority and the departure bar. We also note that petitioner has abandoned the argument that he presented to the BIA, based on *William v. Gonzales*, 499 F.3d 329 (4th Cir. 2007), that the departure bar conflicts with the provisions of the INA relating to motions to reopen, *see* 8 U.S.C. § 1229a(c)(7). (*See* Pet'r Br. 27 n.5.) In *In re Armendarez-Mendez*, 24 I. & N. Dec. at 653-60, the BIA rejected the reasoning of the *William* majority. This issue is presently the subject of a Circuit split. *Compare Rosillo-Puga v. Holder*, 580 F.3d 1147, 1159-60 (10th Cir. 2009) (rejecting the analysis of the *William* majority), *Pena-Muriel v. Gonzales*, 489 F.3d 438 441-43 (1st Cir. 2007) (rejecting the argument that the departure bar was impliedly repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 (Sept. 30, 1996)), *and Mendiola v. Holder*, 585 F.3d 1303, 1310 (10th Cir. 2009) (following *Rosillo-Puga*), *with Coyt v. Holder*, 593 F.3d 902, 907 (9th Cir. 2010) (holding that the departure bar "cannot apply to cause the withdrawal of an administrative petition filed by a petitioner who has been involuntarily removed"). However, because petitioner has abandoned the argument, we do not reach it.

this case, and that the Board did not err when it vacated its September 10, 2008 order on jurisdictional grounds.  We further hold that petitioner has not demonstrated that he is entitled to relief under the equitable doctrine of *nunc pro tunc*.  Accordingly, for the reasons set forth below, the petition for review is denied.

**A.   The Development of the BIA's *Sua Sponte* Authority and the Departure Bar**

The BIA was established through regulations promulgated by the Attorney General in 1940.  *See* Regulations Governing Departmental Organization and Authority, 5 Fed. Reg. 3502, 3503, § 90.2 (Sept. 4, 1940).[3]  These regulations authorized

---

[3] Congress created the first federal agency focused on immigration — the Office of the Superintendent of Immigration — in § 7 of the Act of March 3, 1891, ch. 551, 26 Stat. 1084, 1085.  The Office was part of the Treasury Department until 1903, when it was transferred to the Department of Commerce and Labor.  *See* An Act To establish the Department of Commerce and Labor, Pub. L. No. 87, § 4, ch. 552, 32 Stat. 825, 826 (Feb. 14, 1903).  In 1913, the agency was transferred to the newly created Department of Labor and divided into the Bureau of Immigration and the Bureau of Naturalization.  *See* An Act To create a Department of Labor, Pub. L. No. 426, § 3, ch. 141, 37 Stat. 736, 737 (Mar. 4, 1913).  The two Bureaus were combined in 1933 by President Roosevelt, and the consolidated entity was named the Immigration and Naturalization Service ("INS").  Exec. Order No. 6166, § 14 (June 10, 1933), *reprinted following* 5 U.S.C. § 901.  In 1940, the INS was transferred to the Department of Justice.  *See* Reorganization Plan No. V, 54 Stat. 1238 (effective June 14, 1940); *see also* Alien Registration Act of 1940, Pub. L. No. 670, § 37(a), ch. 439,

the Board to "issue orders of deportation"; "consider and determine appeals"; and resolve motions for "reconsideration, reargument or reopening of a case after the issuance of a final decision." *Id.* at 3503-04, §§ 90.3(a)-(b), 90.10.

In 1952, Congress enacted the INA, also known as the McCarran-Walter Act. Pub. L. No. 82-414, ch. 414, 66 Stat. 163 (June 27, 1952). The INA charged the Attorney General "with the administration and enforcement" of the Act, and authorized him to "establish such regulations . . . as he deem[ed] necessary for carrying out [that] authority." *Id.* § 103(a), 66 Stat. at 173. Pursuant to that congressional delegation, the Attorney General promulgated a series of regulations defining the "[a]ppellate jurisdiction" of the BIA and the "[p]owers of the Board." Immigration and Nationality Regulations, 17 Fed. Reg. 11,469, 11,475, § 6.1(b), (d) (Dec. 19, 1952) (final rule

---

54 Stat. 670, 675 (June 28, 1940). In September 1940, the Attorney General changed the name of the "Board of Review" of the INS to the Board of Immigration Appeals. *See* Regulations Governing Departmental Organization and Authority, 5 Fed. Reg. 3502, 3503, § 90.2 (Sept. 4, 1940). *See generally A Historical Guide to the U.S. Government* 305-08 (George Thomas Kurian *et al.*, eds., 1998). Lastly, effective March 2003, the functions of the INS were transferred to DHS. *See supra* note 1.

codified at 8 C.F.R. §  6.1(b), (d) (1952)).  Section 6.1(d)(1) of those regulations defined the "General[]" "[p]owers of the Board":

> Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case . . . .

8 C.F.R. § 6.1(d)(1) (1952).  The 1952 regulations also allowed for motions to reopen and for reconsideration of Board decisions, and these regulations included the first version of the departure bar.  *See id.* § 6.2.[4]  Two years after these regulations were promulgated, the BIA concluded that the departure bar was a jurisdictional limitation on its authority to consider a motion to reopen when "the alien is outside the United States."  *In re G-y-B*, 6 I. & N. Dec.

_____

[4]  Section 6.2 of the 1952 regulations provided, in pertinent part:

> A motion to reopen or a motion to reconsider shall not be made by or in behalf of a person who is the subject of deportation proceedings subsequent to his departure from the United States.  Any departure of such person from the United States occurring after the making of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion.

8 C.F.R. § 6.2 (1952).

159, 160 (BIA 1954).

In 1958, the Attorney General revised the regulations relating to the BIA's authority to consider motions to reopen. *See* Miscellaneous Amendments to Chapter, 23 Fed. Reg. 9115, 9118-19 (Nov. 26, 1958). The revised regulations established what is now referred to as the BIA's *sua sponte* authority by providing the Board with the power to reopen proceedings and reconsider its decisions "on its own motion." *Id.* at 9118, § 3.2. This BIA authority remained a creature of Attorney General regulations — not restricted or modified by congressional enactments — for more than thirty years.

Congress amended the INA in 1961 in order to add, *inter alia*, provisions relating to judicial review of the BIA's decisions. *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, 75 Stat. 650. Relevant here is § 5(a) of the Act, which established the "sole and exclusive procedure for [] the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States." *Id.* § 5(a), 75 Stat. at 651 (codified at 8 U.S.C. § 1105a(a) (1964) (repealed 1996)). Among the judicial review procedures adopted by Congress was a

14

provision similar to the departure bar regulation, which stated that "[a]n order of deportation or of exclusion shall not be reviewed *by any court* if the alien . . . has departed from the United States after the issuance of the order."  8 U.S.C. § 1105a(c) (1964) (emphasis added); *see also In re Armendarez-Mendez*, 24 I. & N. Dec. at 649 ("[N]early a decade after the departure bar rule went into effect, Congress imposed a similar statutory restriction prohibiting the United States courts of appeals from reviewing deportation orders if the alien 'has departed from the United States after issuance of the order.'" (quoting 8 U.S.C. § 1105a(c) (1964))).

Until 1990, this procedural scheme remained intact, and the substance of the Attorney General's regulations regarding motions to reopen went unchanged.  However, in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (Nov. 29, 1990), Congress directed the Attorney General to "issue regulations with respect to . . . the period of time in which motions to reopen and to reconsider may be offered in deportation proceedings, which regulations [should] include a limitation on the number of such motions that may be filed and a maximum time period for the filing of such

15

motions." *Id.* § 545(d)(1), 104 Stat. at 5066. Congress issued this directive in order to "reduce or eliminate . . . abuses" of regulations that, at that time, permitted aliens to file an unlimited number of motions to reopen without any limitations period. *Stone v. INS*, 514 U.S. 386, 400 (1995).

Although the Attorney General expressed doubt about the need to impose such limitations because there was "little evidence of abuse," she ultimately promulgated regulations that, subject to certain exceptions, permitted an alien to "file one motion to reopen within 90 days." *Dada v. Mukasey*, 128 S. Ct. 2307, 2315 (2008) (citing Executive Office for Immigration Review; Motions and Appeals in Immigration Proceedings, 61 Fed. Reg. 18,900, 18,901, 18,905 (Apr. 29, 1996) (final rule codified at 8 C.F.R. § 3.2(c) (effective July 1, 1996))); *see also Iavorski v. INS*, 232 F.3d 124, 129, 131 (2d Cir. 2000). However, the revised regulations retained additional "mechanisms whereby otherwise untimely motions could still be considered when the circumstances so required." *Iavorski*, 232 F.3d at 131. Chief among these mechanisms were the regulations providing authority to both an IJ and the BIA to reopen, *sua sponte*, a

proceeding. *Id.* (citing 8 C.F.R. §§ 3.2(a), 3.23(b)(1) (2000)).[5]

Approximately three months later, Congress codified some — but not all — of the Attorney General's 1996 regulations regarding motions to reopen. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, § 304, 110 Stat. 3009-546, 3009-587 (Sept. 30, 1996). Neither the departure bar nor the regulation granting the BIA *sua sponte* authority was mentioned in the statute in any fashion. *See In re Armendarez-Mendez*, 24 I. & N. Dec. at 654. But the IIRIRA repealed the INA's judicial review provisions — including the provision precluding post-departure judicial review of BIA orders — and enacted new rules for that process. *See* Pub. L. No. 104-208, div. C, § 306, 110 Stat. at 3009-607 -

---

[5] In addition to the BIA's *sua sponte* authority and the departure bar, 8 C.F.R. § 1003.2(a), (d), the Attorney General's regulations vest in IJs similar authority with analogous departure limitations, *id.* § 1003.23(b)(1) ("An [IJ] may upon his or her own motion at any time . . . reopen or reconsider any case in which he or she has made a decision . . . . Any departure from the United States . . . occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion."). These regulations are "substantively identical" in terms of the authority they provide to IJs and the BIA to consider motions to reopen. *In re Armendarez-Mendez*, 24 I. & N. Dec. at 650.

17

3009-612.  Under these revisions to the INA, an alien is no longer foreclosed from seeking *judicial* review of a BIA order after he or she departs from the country.  *See Dada*, 128 S. Ct. at 2320.

The Attorney General promulgated new regulations based on the IIRIRA on March 6, 1997.  *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).  Although some commenters on the proposed regulations had opined that the IIRIRA impliedly invalidated the departure bar, the Attorney General rejected that view:  "No provision of the [IIRIRA] supports reversing the long established rule that a motion to reopen or reconsider cannot be made in immigration proceedings by or on behalf of a person after that person's departure from the United States."  *Id.* at 10,321. Consequently, the Attorney General retained in her regulations both the departure bar and the BIA's authority to consider a motion to reopen *sua sponte*.  *See id.* at 10,330-31 (final rule codified at 8 C.F.R. § 3.2(a), (d) (1997)).[6]

_____

[6] In response to the Homeland Security Act of 2002, *see supra* note 1, the Attorney General reorganized title 8 of

18

**B.   The BIA's Application of the Departure Bar**

In the present case, the BIA concluded that it "did not have jurisdiction" to enter its September 10, 2008 order reopening petitioner's removal proceedings because petitioner had already been removed from the United States. The Board vacated the order and dismissed the appeal, citing the departure bar and *In re Armendarez-Mendez*.  Petitioner now argues that the departure bar regulation "goes against the plain language" of the portion of the regulation governing the BIA's *sua sponte* authority.  However, the BIA rejected a similar contention in *In re Armendarez-Mendez*. We hold that the BIA's interpretation is entitled to deference and that it requires us to reject petitioner's argument.

Under the current version of the INA, an alien who is to be removed pursuant to an order of the BIA typically has ninety days after the Board's decision becomes final to file

---

the Code of Federal Regulations to reflect the transfer of the functions of the INS from the Department of Justice to the DHS.  *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003).  As a result, the regulation governing the BIA's *sua sponte* authority and the applicable departure bar was moved — without changes — from 8 C.F.R. § 3.2 (2002), to 8 C.F.R. § 1003.2 (2009).

19

a motion to reopen.  *See* 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); *see also Ali v. Gonzales*, 448 F.3d 515, 517 (2d Cir. 2006) (per curiam).[7]  Petitioner's motion to reopen was untimely in this regard, as it was filed approximately five years after the removal order became final.

The INA also enumerates statutory exceptions that allow this ninety-day time limit to be excused or extended.  For example, an otherwise-untimely motion to reopen may be permitted if the alien seeks asylum based on "changed country conditions arising in the country of nationality or the country to which removal has been ordered."  8 U.S.C. § 1229a(c)(7)(C)(ii).  We have also held that the ninety-day deadline for filing a motion to reopen is subject to

---

[7] Section 1229a(c)(7)(A) — titled "Motions to Reopen," "In general" — provides:

> An alien may file one motion to reopen [removal] proceedings under this section, except that this limitation shall not apply so as to prevent the filing of one motion to reopen described in subparagraph (C)(iv).

8 U.S.C. § 1229a(c)(7)(A).  Section 1229a(c)(7)(C)(i) sets forth the "general" deadline for such a motion:

> Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

*Id.* § 1229a(c)(7)(C)(i).

20

equitable tolling under appropriate circumstances. *See Iavorski*, 232 F.3d at 134 (holding that the limitations period for untimely motions to reopen can be equitably tolled to accommodate claims of ineffective assistance of counsel). However, petitioner's motion to reopen did not rely on any of the INA's statutory exceptions to the ninety-day time limit, and he did not argue that he is entitled to equitable tolling.

Instead, petitioner asked the BIA to invoke its *sua sponte* authority to reopen his removal proceedings. The wellspring of this authority resides, as it always has, in a regulation promulgated by the Attorney General: "The Board may at any time reopen or reconsider *on its own motion* any case in which it has rendered a decision. . . . The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, *subject to the restrictions of this section*." 8 C.F.R. § 1003.2(a) (emphases added).[8] However, after the Board realized that

---

[8] Section 1003.2(a) provides:

General. The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision. A request to reopen or reconsider any case in which a decision has been made by the Board, which request is made by the Service, or by the party affected by the decision,

21

petitioner had been removed, it took the view that it was divested of jurisdiction to consider his motion based on the departure bar, which states that "[a]ny departure from the United States, including the . . . removal of a person who is the subject of . . . removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion."  8 C.F.R. § 1003.2(d).[9]

The basis for the BIA's interpretation of the departure

_____

must be in the form of a written motion to the Board.  The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the restrictions of this section.  The Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief.

8 C.F.R. § 1003.2(a).

[9] Section 1003.2(d) provides:

Departure, deportation, or removal.  A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States.  Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

8 C.F.R. § 1003.2(d).

22

bar as a jurisdictional limitation on its *sua sponte* authority is *In re Armendarez-Mendez*. In that case, the BIA noted that it has had "regulatory power to entertain motions, subject to such limitations as the Attorney General may prescribe," since 1940, but that "there was no statute delineating the scope or limits of that power" until Congress passed the Immigration Act of 1990. 24 I. & N. Dec. at 647, 654. Moreover, the Board reasoned, "[a]s early as 1954" and "in an unbroken string of precedents extending over 50 years," it has "construed the departure bar rule as imposing a limitation on [its] jurisdiction to entertain motions filed by aliens who had departed the United States." *Id.* at 648 (citing, *inter alia*, *In re G-y-B*, 6 I. & N. Dec. at 159-60). Based on those first principles, the BIA "reaffirm[ed]" its "established understanding" of the departure bar as a jurisdictional limitation on its *sua sponte* authority, and it rejected the Ninth Circuit's construction of the departure bar in *Zi-Xing Lin v. Gonzales*, 473 F.3d 979, 981-82 (9th Cir. 2007) (relying on the rule of lenity to hold that 8 C.F.R. § 1003.23(b)(1) does not deprive an IJ of jurisdiction to consider a motion to reopen filed by a removed alien). *In re Armendarez-*

*Mendez*, 24 I. & N. Dec. at 650-53, 660.[10]

We review *de novo* legal questions decided by the BIA. *See Phong Thanh Nguyen v. Chertoff*, 501 F.3d 107, 111 (2d Cir. 2007). However, we owe "substantial deference" to the BIA's interpretation of the applicable regulation in *In re Armendarez-Mendez*, unless we find that interpretation to be "plainly erroneous or inconsistent with the regulation." *Padmore v. Holder*, 609 F.3d 62, 67 (2d Cir. 2010) (internal quotation marks omitted); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997).

---

[10] More recently, the BIA has placed a caveat on its conclusion that the departure bar deprives it of jurisdiction to consider motions to reopen. In *In re Bulnes-Nolasco*, 25 I. & N. Dec. 57 (BIA 2009), the BIA took the position that an IJ's application of a different departure bar regulation, 8 C.F.R. § 1003.23(b)(1), "in a case involving an inoperative *in absentia* deportation order would give that order greater force than it is entitled to by law." 25 I. & N. Dec. at 59-60 (citing 8 C.F.R. § 1003.23(b)(4)(iii)(A)(2)). Therefore, in the BIA's view, "an alien's departure from the United States while under an outstanding order of deportation or removal issued *in absentia* does not deprive the [IJ] of jurisdiction to entertain a motion to reopen to rescind the order if the motion is premised on lack of notice." *Id.* at 60. The removal order in this case was not entered with petitioner *in absentia*, and petitioner does not argue that he lacked notice of the proceedings (at which he was present and represented by counsel). Therefore, any limitation on *In re Armendarez-Mendez* resulting from the BIA's subsequent decision in *In re Bulnes-Nolasco* is not material to our analysis.

24

To be sure, the BIA's construction is anything but airtight. With respect to the departure bar, it is linguistically awkward to consider the forcible removal of an alien as "constitut[ing] a withdrawal" of any pending motions filed by the alien, 8 C.F.R. § 1003.2(d). *See Marin-Rodriguez v. Holder*, --- F.3d ----, No. 09-3105, 2010 WL 2757321, at *2 (7th Cir. July 14, 2010) (reasoning that the departure bar regulation "amounts to saying that, by putting an alien on a bus, the agency may 'withdraw' its adversary's motion"); *cf. Madrigal v. Holder*, 572 F.3d 239, 245-46 (6th Cir. 2009) (Kethledge, J., concurring). And, when the departure bar is read in isolation, it is not readily apparent why the "withdrawal" that it effects is jurisdictional in nature. *See Marin-Rodriguez*, 2010 WL 2757321, at *3. Moreover, the portion of the regulation governing the BIA's *sua sponte* authority permits the Board to exercise that power "at any time." 8 C.F.R. § 1003.2(a). But the BIA apparently understands the phrase "at any time" to mean "at any time that the alien in question is physically present in the United States." Finally, although *In re Armendarez-Mendez* is couched in jurisdictional terms without qualification, it is unclear why a "withdrawal"

25

under the departure bar would deprive the BIA of authority to either:  (1) act in a purely *sua sponte* fashion, unprompted by a person who has been removed; or (2) consider a motion to reopen filed by DHS rather than a person who is being, or has been, removed.  For example, in *Marin-Rodriguez* the BIA appears to have resolved a motion for reconsideration filed by DHS pursuant to the INA, despite knowing full well that the departure bar was in play because the petitioner had already been removed.  *See Marin-Rodriguez*, 2010 WL 2757321, at *1.

Though we do not intend to create an exhaustive list of our concerns through these examples, the point is clear:  Were we writing on a blank slate, we might reach a different conclusion than that of the BIA regarding the relationship between these portions of 8 C.F.R. § 1003.2.  But, in light of *In re Armendarez-Mendez*, we are not presented with a blank slate.  The BIA tells us that the departure bar serves as a jurisdictional limitation on its *sua sponte* authority.  Under the circumstances of this case — where petitioner filed an otherwise-barred motion to reopen and asked the BIA to invoke its *sua sponte* authority — we cannot say that the Board's construction is plainly erroneous.

First, even before the BIA offered its precedential interpretation, we indicated, in dicta, that an alien's voluntary departure from the country would result in a "forfeiture of the right to file a motion to reopen." *Singh v. Gonzales*, 468 F.3d 135, 140 (2d Cir. 2006) (citing 8 C.F.R. § 1003.2(d)). And we were not alone in this regard. *See Mansour v. Gonzales*, 470 F.3d 1194, 1198 (6th Cir. 2006); *Navarro-Miranda v. Ashcroft*, 330 F.3d 672, 676 (5th Cir. 2003). *But see Zi-Xing Lin*, 473 F.3d at 981-82. Moreover, following *In re Armendarez-Mendez*, two Circuits have reached conclusions similar to that of the BIA and held that the departure bar deprives the Board of authority to consider a motion to reopen that would otherwise be defective under the INA. *See Toora v. Holder*, 603 F.3d 282, 288 (5th Cir. 2010); *Mendiola v. Holder*, 585 F.3d 1303, 1310 (10th Cir. 2009); *Rosillo-Puga v. Holder*, 580 F.3d 1147, 1159-60 (10th Cir. 2009); *Ovalles v. Holder*, 577 F.3d 288, 296-97 (5th Cir. 2009). That our Court and others have interpreted 8 C.F.R. § 1003.2 in a fashion similar to the BIA supports the conclusion that the Board's view in *In re Armendarez-Mendez* is not plainly erroneous.

Second, although certain language from *In re*

27

*Armendarez-Mendez* cuts broadly, we need only examine the merits of the Board's position with respect to the situation presented here. Approximately five years after petitioner's removal proceedings became final, he filed a motion to reopen that asked the BIA to invoke its *sua sponte* authority. There is no dispute here that the Attorney General's decision to provide the BIA with such authority was a valid use of his rulemaking power under the INA. And petitioner has not argued that the *sua sponte* power itself is inconsistent with the statute. This comes as no surprise, as there was no statutory basis for his motion. Be that as it may, the BIA's position in *In re Armendarez-Mendez* has more force in the context of a motion in which an alien asks the BIA to rely on jurisdiction that comes from a regulation rather than a statute. If the Attorney General possesses the authority to vest *sua sponte* jurisdiction in the BIA — and it is undisputed here that he does — then it stands to reason that he would also have the authority to limit that jurisdiction and define its contours through, among other things, the departure bar.

Third, when the text of § 1003.2 is viewed as a whole, it is not unreasonable to interpret the departure bar as a

28

limitation on the BIA's *sua sponte* authority. *Cf. In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009) (noting that statutory interpretation calls for an examination of "the specific context in which [the] language is used, and the broader context of the statute as a whole" (internal quotation marks omitted)). Paragraph (a) of § 1003.2, which is titled "General," refers to the Board's authority to not only reopen a proceeding *sua sponte*, but also to resolve motions to reopen or reconsider filed by either DHS or "the party affected by the decision." 8 C.F.R. § 1003.2(a). However, the "[g]eneral" authority conferred upon the BIA by the Attorney General in § 1003.2(a), which may be exercised "at any time," is not absolute. *Id.* Rather, paragraph (a) makes clear that the BIA's *sua sponte* authority is "subject to the restrictions of . . . section [1003.2]." *Id.* The more-specific departure bar, codified within "this section" at paragraph (d), may reasonably be interpreted as a "restriction[]" on the "[g]eneral" *sua sponte* provision in paragraph (a). *Id.; see also Navarro-Miranda*, 330 F.3d at 676. Therefore, at least insofar as the BIA's *sua sponte* authority is concerned — and we need not go any further in this case — the Board's

interpretation of the departure bar as a jurisdictional limitation is not plainly inconsistent with the terms of 8 C.F.R. § 1003.2 when the regulation is read as a whole.

Finally, the BIA's construction is supported by the historical evolution of this regulation. At least since the Alien Registration Act of 1940, Congress has delegated to the Attorney General broad authority to establish rules and regulations to enforce the nation's immigration laws. *See* Pub. L. No. 670, § 37(a), ch. 339, 54 Stat. at 675. Relying on that congressional delegation, the Attorney General established the departure bar in 1952 and later empowered the BIA to reopen immigration proceedings *sua sponte*. Since 1954, the Board has taken the position that the departure bar operates as a limitation on its jurisdiction to consider motions to reopen. *See In re G-y-B*, 6 I. & N. Dec. at 160. This limitation must be understood in connection with the BIA's position "within the larger immigration bureaucracy." *In re Armendarez-Mendez*, 24 I. & N. Dec. at 656. By divesting the BIA of authority over persons removed from the country, the Attorney General preserved the jurisdictional primacy of DHS and the State Department over "the inspection and admission of aliens from abroad." *Id.*

30

Congress, through decades of silence on this subject despite repeated amendments to the INA,[11] has acquiesced in the BIA's understanding of the authority granted to it by the Attorney General. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986); *United Airlines, Inc. v. Brien*, 588 F.3d 158, 172-73 (2d Cir. 2009); *see also William*, 499 F.3d at 344 (Williams, C.J., dissenting) ("Given the INA's silence with respect to the departure bar, I understand Congress's failure to explicitly repeal 8 C.F.R. § 1003.2(d) as acquiescence to its continued operation."). Although the INA was enacted in 1952, *see* Pub. L. No. 82-414, 66 Stat. at 163, Congress provided no limitations on the scope of the BIA's authority to consider motions to reopen until the Immigration Act of 1990, Pub. L. No. 101-649, § 545(d)(1), 104 Stat. at 5066. Even then, Congress left it to the Attorney General to consider in the first instance the policy decisions regarding appropriate limitations to be imposed on these motions. *See id.* When

---

[11] *See, e.g.*, IIRIRA, Pub. L. No. 104-208, 110 Stat. at 3009-546 (Sept. 30, 1996); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. at 4978 (Nov. 29, 1990); Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (Nov. 6 1986); Immigration and Nationality Act Amendments of 1976, Pub. L. No. 94-571, 90 Stat. 2703 (Oct. 20, 1976); Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911.

the Attorney General responded to that legislative mandate in 1996, she saw fit to retain the departure bar. *See* 8 C.F.R. § 3.2 (1996).

In the same year, 1996, Congress revised the INA by passing the IIRIRA. *See* Pub. L. No. 104-208, div. C, 110 Stat. at 3009-546. Although the IIRIRA repealed the portion of the INA that precluded *judicial* review of a BIA decision after an alien leaves the country, *see id.* § 306, 110 Stat. at 3009-607, the Act was silent as to both the departure bar and the BIA's *sua sponte* authority. There is nothing incongruous about retaining the latter but excising the former, for "judicial review of an alien's petition for review with respect to a *final order of removal* is not the same as BIA review of a *motion to reopen*." *William*, 499 F.3d at 343 (Williams, C.J., dissenting) (emphases in original). By allowing courts to review BIA decisions even after the alien leaves the United States, Congress empowered us to oversee, *inter alia*, the manner in which the BIA polices its jurisdictional boundaries. In any event, the congressional silence in the IIRIRA regarding § 1003.2 is not inconsistent with the BIA's position. Therefore, for all of these reasons, we cannot conclude that *In re*

32

*Armendarez-Mendez*, as it applies to the facts of this case, is plainly erroneous.

There is some superficial tension between our conclusion and a recent decision of the Seventh Circuit. *See Marin-Rodriguez*, 2010 WL 2757321, at *3-4. In *Marin-Rodriguez*, the petitioner filed a motion for reconsideration approximately one month after the BIA dismissed his appeal. *See id.* at *1. Thus, unlike in this case, the motion was timely under the INA. *See* 8 U.S.C. § 1229a(c)(7)(C)(i). The Board granted the motion and remanded to the IJ, apparently unaware at the time that the petitioner had been removed from the country while the motion was pending. *See Marin-Rodriguez*, 2010 WL 2757321, at *1. The DHS then filed a motion for reconsideration of its own, which the BIA granted based on the departure bar. *Id.*

Because the petitioner's only motion for reconsideration was timely under the INA, the facts of *Marin-Rodriguez* resemble those considered by the Fourth Circuit in *William*. *See* 499 F.3d at 334 n.5. But the Seventh Circuit rejected the Fourth Circuit's "understanding" of the INA. *Marin-Rodriguez*, 2010 WL

33

2757321, at \*2.  Referring to the Supreme Court's analysis in *Dada v. Mukasey*, the *Marin-Rodriguez* court reasoned as follows:

> If the Supreme Court sees no incompatibility between a statutory right to apply for [voluntary departure] and an implied-withdrawal approach [to situations where an alien seeks to reopen his removal proceedings after agreeing to voluntarily depart], it is hard to fault the Board for adopting a similar view.  Thus an alien with a right to move for reconsideration [under the INA] may give up that right by a specified act [such as departing from the country].

*Id.*[12]  Nevertheless, the court went on to reason that the "validity" of "the particular condition the Board has attached" on motions to reopen — *i.e.*, physical presence in the United States — "must be ascertained on other grounds."

---

[12] In *Dada*, the Supreme Court confronted the tension between:  (1) the time period that an alien is afforded to leave the country if he agrees to depart voluntarily, which may be as short as sixty days, *see* 8 U.S.C. § 1229c(b)(2); and (2) the ninety-day time period that an alien is afforded to file a motion to reopen his removal proceedings, *see* 8 U.S.C. § 1229a(c)(7)(C)(i).  The Court held that "to safeguard the right to pursue a motion to reopen for voluntary departure recipients, the alien must be permitted to withdraw, unilaterally, a voluntary departure request before expiration of the departure period, without regard to the underlying merits of the motion to reopen."  *Dada*, 128 S. Ct. at 2319.  The Court also suggested that "[a] more expeditious solution" to the issue in that case "might be to permit an alien who has departed the United States to pursue a motion to reopen postdeparture."  *Id.* at 2320.  However, the departure bar was not placed in issue by the parties in *Dada*, and the Court expressly declined to consider it.  *See id.*

34

*Id.*

With the issue thus framed, the court went on to hold that, "[a]s a rule about subject-matter jurisdiction, § 1003.2(d) is untenable." *Id.* at *3. It reasoned that, although the INA authorizes the Board to reconsider or reopen its own decisions, the statute "does not make that step depend on the alien's presence in the United States." *Id.* "[S]ince [the IIRIRA was passed in] 1996 nothing in the statute undergirds a conclusion that the Board lacks 'jurisdiction' — which is to say, adjudicatory competence — to issue decisions that affect the legal rights of departed aliens." *Id.* (internal citation omitted). The Seventh Circuit then cited *Union Pacific Railroad v. Brotherhood of Locomotive Engineers*, 130 S. Ct. 584 (2009), for the proposition that "an administrative agency is not entitled to contract its own jurisdiction by regulations or by decisions in litigated proceedings." *Marin-Rodriguez*, 2010 WL 2757321, at *3. In the court's view, *Union Pacific* was "dispositive in favor of the holding in *William* — though on a rationale distinct from the [F]ourth [C]ircuit's." *Id.* at *3.

Properly understood, the analysis in *Marin-Rodriguez*

35

does not conflict with ours.  The point is made clear by reference to the source of BIA jurisdiction that was invoked by the petitioner in each case.  In *Marin-Rodriguez*, the petitioner's motion for reconsideration was explicitly authorized by the INA; Congress, by enacting the IIRIRA, gave the BIA jurisdiction to consider one such motion if it is filed within ninety days after the removal decision becomes final.  *See* 8 U.S.C. § 1229a(c)(7)(C)(i).  In this case, however, petitioner was not eligible to avail himself of this statutory entitlement under the INA.  Instead, in support of his motion, he invoked the regulation in which the Attorney General authorized the BIA to consider motions to reopen *sua sponte*.  *See* 8 C.F.R. § 1003.2(a).

Consequently, we need not decide if the Attorney General, by promulgating § 1003.2, has improperly "contract[ed]" the jurisdiction given to the BIA by Congress pursuant to the IIRIRA.  *Marin-Rodriguez*, 2010 WL 2757321, at *3.  We leave that question for another day.  *See supra* note 2.  The *sua sponte* power that is at issue here is — and always has been — a creature of regulations promulgated by the Attorney General pursuant to a valid delegation from Congress.  *See* 8 U.S.C. § 1103(g)(2).  The Attorney

36

General's power to limit this aspect of the BIA's jurisdiction is subsumed within his more expansive power to create it. Therefore, the BIA's understanding of the departure bar as a limitation on its *sua sponte* jurisdiction, as opposed to its jurisdiction to consider timely motions to reopen under the INA, cannot be said to be "untenable."

In reaching this conclusion, we are mindful of the admonition from *Union Pacific* that "the word 'jurisdiction' has been used by courts . . . to convey 'many, too many, meanings,'" and that "profligate use of the term" is to be avoided. 130 S. Ct. at 596 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). In *Union Pacific*, the Supreme Court considered the nature of provisions in the Railway Labor Act ("RLA") that required parties to labor disputes to attempt to reach a settlement "in conference" before submitting the matter to arbitration before the National Railroad Adjustment Board ("NRAB"). *See id.* at 591-92 & n.3 (citing 45 U.S.C. § 152 Second, Sixth). The NRAB had characterized the "in conference" requirement as a limitation on its jurisdiction, and the Supreme Court disagreed.

Congress vested the NRAB with jurisdiction over "*all disputes* between carriers and their employees 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Slocum v. Delaware, Lackawanna & W. R.R. Co.*, 339 U.S. 239, 240 (1950) (emphasis added) (quoting 45 U.S.C. § 153 First (i)). Moreover, "Congress gave the [NRAB] no authority to adopt rules of jurisdictional dimension." *Union Pac.*, 130 S. Ct. at 597 (citing 45 U.S.C. § 153 First (v)). Based largely on the absence of such a delegation, the Court held that the RLA's "in conference" requirement did not limit the NRAB's statutory jurisdiction and the NRAB lacked authority to characterize it in that fashion. *See id.* at 598. As such, the requirement is merely a claim-processing rule, and any defenses based on non-compliance with it are forfeitable.

Unlike in *Union Pacific*, this is not an instance where a statute vests an agency with broad authority that the agency has declined to exercise. Whereas the NRAB's jurisdiction is established in the statute that created it and the NRAB's rulemaking authority is rather limited, Congress delegated the authority to define some aspects of

38

the BIA's jurisdiction to the Attorney General. *Compare* 45 U.S.C. § 153 First (v) (authorizing the NRAB to "adopt such rules as it deems necessary to control proceedings before the respective divisions and not in conflict with the provisions of this section"), *with* 8 U.S.C. § 1103(g)(2) (authorizing the Attorney General to "establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, *review such administrative determinations in immigration proceedings, delegate such authority*, and perform such other acts as the Attorney General determines to be necessary for carrying out this section" (emphasis added)). It is undisputed in this case that the delegation to the Attorney General includes the authority to promulgate regulations defining — indeed, expanding — the BIA's jurisdiction to consider motions to reopen otherwise-final removal proceedings. And petitioner has not argued that the manner in which the Attorney General has chosen to define the BIA's jurisdiction conflicts with the INA or leads to some sort of interpretive problem under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Thus, we are mindful of the analytical approach taken by the Supreme Court in *Union*

39

*Pacific*, as well as that of the Seventh Circuit in *Marin-Rodriguez*, but the holdings in those cases are inapposite.

Therefore, we hold that the BIA is not plainly erroneous in its position, expressed in *In re Armendarez-Mendez*, that the departure bar limits its *sua sponte* jurisdiction.  Accordingly, because the Board is entitled to deference with respect to that view, it did not err in concluding that § 1003.2(d) deprived it of authority to consider petitioner's motion to reopen after he was removed from the country.

**C.  *Nunc Pro Tunc* Relief**

Petitioner also argues that, as a matter of equity, he is entitled to *nunc pro tunc* relief in order to avoid the application of the departure bar.[13]  He asserts that this relief is warranted because the BIA erred by denying his motion for a stay of removal on July 17, 2008.  Had the stay been granted, petitioner contends, he would not have been removed from the country prior to the Board's order granting

---

[13] The phrase *nunc pro tunc* means, literally, "now for then."  *Iouri v. Ashcroft*, 464 F.3d 172, 182 (2d Cir. 2006) (internal quotation marks omitted).  "When a matter is adjudicated *nunc pro tunc*, it is as if it were done as of the time that it should have been done."  *Edwards v. INS*, 393 F.3d 299, 308 (2d Cir. 2004); *accord Blake v. Carbone*, 489 F.3d 88, 94 n.5 (2d Cir. 2007).

his motion to reopen.  Therefore, in petitioner's view, the appropriate remedy is that the BIA's September 10, 2008 order, which reopened his removal proceedings and remanded the case for "clarification" of the IJ's finding that his asylum application was frivolous, "should have been granted *nunc pro tunc* to the date of the erroneous denial of his motion for a stay of removal."  (Pet'r Br. 22.)

"It is . . . beyond question that an award of *nunc pro tunc* may, *in an appropriate circumstance*, be granted as a means of rectifying error in immigration proceedings." *Edwards v. INS*, 393 F.3d 299, 309 (2d Cir. 2004) (emphasis added, footnote omitted).  However, the doctrine of *nunc pro tunc* "is a 'far-reaching equitable remedy' applied in 'certain exceptional cases,' typically aimed at 'rectify[ing] any injustice [to the parties] suffered by them on account of judicial [or agency] delay.'"  *Iouri v. Ashcroft*, 464 F.3d 172, 182 (2d Cir. 2006) (quoting *Iavorski*, 232 F.3d at 130 n.4 and *Weil v. Markowitz*, 829 F.2d 166, 175 (D.C. Cir. 1987)).  We have not previously decided whether the doctrine of *nunc pro tunc* is available as a means of providing equitable relief where the BIA is divested of jurisdiction by the departure bar to consider an

41

alien's motion to reopen.  To our knowledge, the BIA has not expressed a view on this question, either.[14]  Nevertheless, we need not resolve that issue in this case.  Even assuming, *arguendo*, that the departure bar does not foreclose equitable relief, petitioner has not demonstrated that a *nunc pro tunc* remedy is warranted.

Petitioner relies principally on *Edwards v. INS*.  There, the BIA denied three aliens an opportunity to apply for "§ 212(c) relief," *i.e.*, a waiver of deportation,[15] based on an interpretation of the INA that we later deemed

---

[14] The availability of *nunc pro tunc* relief to a removed alien, at least under certain circumstances, would be consistent with some aspects of the BIA's analysis in *In re Bulnes-Nolasco*, 25 I. & N. Dec. at 59-60.

[15] The phrase "§ 212(c) relief," as used in *Edwards*, referred to waivers of deportation under the INA, 8 U.S.C. § 1182(c) (1994) (repealed 1996).  Aliens were required to demonstrate three criteria in order to be eligible for § 212(c) relief:

> 1) that they possessed lawful permanent resident status; 2) that they had been lawfully domiciled in the United States for seven or more years; and 3) if they had been convicted of an aggravated felony or felonies, that they had served less than five years in prison on those aggravated felony offenses.

*Edwards*, 393 F.3d at 307.  In the IIRIRA, Congress "replaced § 212(c) relief with a new form of discretionary relief known as 'cancellation of removal.'"  *Edwards*, 393 F.3d at 302 & n.4 (citing 8 U.S.C. § 1229b).

42

to be legally erroneous, *see St. Cyr v. INS*, 229 F.3d 406, 418 (2d Cir. 2000), *aff'd* 533 U.S 289, 326 (2001); *Henderson v. INS*, 157 F.3d 106, 130 (2d Cir. 1998). *See Edwards*, 393 F.3d at 303-06. After the BIA erroneously denied the § 212(c) relief, each petitioner accrued more than five years' imprisonment, which rendered them independently ineligible for the waiver under the INA as it existed at the time. *See id.* at 307 (citing 8 U.S.C. § 1182(c) (1994) (repealed 1996)). Following the decisions in *Henderson* and *St. Cyr*, the *Edwards* petitioners asked the BIA to reopen their immigration proceedings and to reconsider whether they were eligible for § 212(c) relief. *See id.* at 303. These applications were denied, however, on the alternative basis that each petitioner had been incarcerated for more than five years. *See id.* at 303-06.

In *Edwards*, we rejected the application of the INA's five-year bar and concluded that, under the doctrine of *nunc pro tunc*, the petitioners were entitled to apply for § 212(c) relief based on the facts as they existed at the time of their initial, erroneously denied applications. *See id.* at 312. We held that "an award of *nunc pro tunc* relief [should] ordinarily be available where agency error would

43

otherwise result in an alien being deprived of the opportunity to seek a particular form of deportation relief." *Id.* at 310-11. On the other hand, "agency error would not 'result' in an alien being deprived of the opportunity to seek deportation relief where the alien would have independently been barred *at the time* of the error from applying for the form of relief at issue." *Id.* at 311 n.15 (emphasis in original).

Petitioner seeks to attribute error to the BIA's denial of his request for a stay of removal. In denying that aspect of his motion, the Board reasoned that it "ha[d] concluded that there [was] little likelihood that the motion [to reopen would] be granted." Petitioner asserts that there is "no question" that the BIA erred in issuing this decision because the Board ultimately granted the motion to reopen, notwithstanding its initial characterization of the submission as having "little likelihood" of success. (Pet'r Br. 24.)

This contention, though flawed as a matter of formal logic, is not without intuitive appeal. *Cf. Dada*, 128 S. Ct. at 2320 (suggesting that "it may constitute an abuse of discretion for the BIA to" deny a motion for a stay of

44

removal "where the motion states nonfrivolous grounds for reopening"). However, in *Edwards* we concluded that principles of equity favored a *nunc pro tunc* remedy in response to a "significant error" by the BIA. 393 F.3d at 309. There, the "significan[ce]" of the error had a constitutional dimension: We noted that "an erroneous denial of the opportunity to apply for § 212(c) relief may constitute a due process violation." *Id.* at 308-09 (citing *United States v. Copeland*, 376 F.3d 61, 70-71 (2d Cir. 2004) and *United States v. Sosa*, 387 F.3d 131, 138 (2d Cir. 2004)). By contrast, in assessing the BIA's denial of petitioner's application for a stay of removal, it must be remembered that: (1) petitioner's motion to reopen relied on the Board's "entirely discretionary" *sua sponte* authority, *Ali*, 448 F.3d at 518;[16] and (2) because the motion was based on a 2007 BIA decision, *In re Y-L-*, that was issued after petitioner's 2001 merits hearing, the motion did not, strictly speaking, call into question the merits or procedure underlying the IJ's findings, *cf. NLRB*

---

[16] We note that questions relating to the manner in which the BIA *exercises* its *sua sponte* authority, which we lack jurisdiction to review, are distinct from questions relating to the BIA's understanding of the regulation governing the scope of this authority, which present interpretive issues that are squarely within our province.

*v. Coca-Cola Bottling Co.*, 55 F.3d 74, 78 (2d Cir. 1995) ("Appellate courts ordinarily apply the law in effect at the time of the appellate decision . . . ."). Viewed in that light, the BIA's denial of petitioner's motion for a stay of removal due to its belief that the motion was unlikely to succeed was not, as petitioner suggests, necessarily an abuse of discretion.

Moreover, there is no allegation of undue dely or misconduct by the BIA in resolving petitioner's motion to reopen. If anyone can be faulted for "delay," *Iouri*, 464 F.3d at 182, it is petitioner. He did not appeal the IJ's original findings to this Court after the BIA affirmed her decision in 2003, and he did not file his motion to reopen and the application for a stay of removal until after he was placed in detention and his removal was imminent. The motion was also filed almost fifteen months after the issuance of the BIA decision upon which it relied, *In re Y-L-*. It was for these reasons that the BIA properly characterized petitioner's 2008 submission as "opportunistic."[17] *Cf. Azize v. Bureau of Citizenship &*

_____

[17] In its September 10, 2008 order, the BIA took the view that petitioner's motion was "opportunistic" because he "did not file [the] motion at the time [the Board] issued [*In re Y-L-*]" and instead "filed the motion only after he

46

*Immigration Servs.*, 594 F.3d 86, 93 (2d Cir. 2010) (Jacobs, C.J., dissenting) (reasoning that the petitioner's delay in seeking relief militated against granting a *nunc pro tunc* remedy); *Edwards*, 393 F.3d at 311 n.15 (noting that *nunc pro tunc* relief may be "rendered *in* appropriate by the existence of unclean hands, or other equitable factors" (emphasis in original)). This timing takes on added significance due to petitioner's argument that, because his father was granted asylum in 2006, he would be eligible for asylum as a derivative beneficiary under the Child Status Protection Act ("CSPA"), *see* 8 U.S.C. § 1158(b)(3), if the IJ were to vacate her finding that his prior application was frivolous. Because petitioner has offered almost no documentation to support this contention, we are unable to assess its merits. However, potential eligibility for asylum under the CSPA gave petitioner and his counsel every reason to pursue challenges to the IJ's frivolousness finding both zealously and expeditiously. Petitioner did not do so and instead waited until the eleventh hour to file his motion for a stay of removal.

---

was placed in detention and his removal became imminent." The BIA's characterization is consistent with the fact that petitioner filed the motion on July 15, 2008 but was removed just seven days later, on July 22.

Finally, in *Edwards* it was crucial to our analysis that the relief for which those petitioners sought to apply was granted "in a significant percentage of cases." 393 F.3d at 311. In fact, we remanded one of the cases with specific instructions to grant the petitioner § 212(c) relief without any further proceedings. *See id.* at 312. But that cannot be said in this case. Petitioner has asked us to direct that the BIA's September 10, 2008 order be entered, *nunc pro tunc*, as of the date the Board denied his motion for a stay of removal. However, that order did not vacate the IJ's frivolousness finding. Instead, the BIA reopened and remanded the removal proceedings "for *clarification*," and the Board specifically noted that it did "not necessarily disagree with the [IJ's] ultimate findings." (JA 19-20 (emphasis added).)

As such, the link between the relief petitioner wishes to pursue and the mechanism by which he hopes to obtain it is far more attenuated than in *Edwards*. The procedural mechanism to which petitioner seeks access through the doctrine of *nunc pro tunc* is a remand to the IJ for compliance with *In re Y-L-*. But he does not simply seek a more thorough explanation, he hopes to have the

48

frivolousness finding vacated. Petitioner offers nothing but speculation as to how, in the context of such a remand, he would obtain that relief.

Balanced against this conjecture, we find little reason in the record to think that the IJ would abandon her frivolousness finding. At the outset of the April 4, 2001 merits hearing regarding petitioner's applications for relief from removal, the IJ issued warnings about the consequences of filing a frivolous application for asylum. (JA 178.) The BIA recently clarified the guidance it offered in *In re Y-L-* by noting that "[s]ufficient notice [of the possibility of a frivolousness finding] is afforded when the [IJ] explains the consequences of filing a frivolous asylum application, either at the time the asylum application is filed or prior to commencement of the merits hearing." *In re B-Y-*, 25 I. & N. Dec. 236, 242 (BIA 2010). After receiving this notice, petitioner indicated that he understood the IJ's warnings and elected to proceed with his application. (JA 179, 182-83.) Early in his testimony, the IJ indicated to petitioner that the manner in which he was answering questions was adversely affecting her assessment of his credibility. (*See* JA 197-98 ("The law provides that

49

if you only give vague answers you may well be denied [asylum] for that reason alone because it may impair your believability."); *see also id.* at 198.) Subsequently, while petitioner was being cross-examined, the IJ made a finding on the record that one of his responses was not "credible, believable or factually accurate." (JA 224.)

Immediately following petitioner's testimony, the IJ ruled on the record that his asylum application was "entirely frivolous." (JA 229.) The IJ reasoned as follows: "I believe the lies you have told to the [c]ourt are *material* and I believe they were told to the [c]ourt *purely to secure an* [i]*mmigration benefit*." (*Id.* (emphases added).) After the hearing, the IJ issued a nineteen-page decision that reviewed petitioner's testimony, nearly line by line; identified numerous statements that she viewed as misrepresentations; and characterized his testimony, on the whole, as "absurd." (JA 88; *see also id.* at 76 ("It is the [c]ourt's opinion that [Zhang] just plain made this up."); *id.* at 77 ("[T]his is the vaguest testimony I have heard in a long time and . . . [Zhang] gave the [c]ourt the impression repeatedly during this hearing that he had memorized a story and was afraid he would miss a bit . . .

50

.").) In the conclusion of the decision, the IJ found that petitioner had submitted "a frivolous application for asylum . . . supported entirely by . . . perjurious testimony." (JA 90.) On direct appeal, the BIA affirmed and adopted the IJ's decision as its own. Petitioner did not seek judicial review of that conclusion.

Thus, although it is largely undisputed that the IJ's frivolousness finding ran afoul of the intervening procedural protections articulated by the BIA in *In re Y-L-*, petitioner has done little to challenge the IJ's findings that: (1) his testimony was "perjurious" as to "material" elements of his asylum application; and (2) he committed such perjury "purely to secure an [i]mmigration benefit." *See* 8 C.F.R. § 1208.20 ("[A]n asylum application is frivolous if any of its material elements is deliberately fabricated."). Therefore, petitioner's speculation that he could obtain vacatur of the IJ's frivolousness finding in a remand pursuant to *In re Y-L-* runs headlong into a record that strongly suggests that the IJ would not abandon that conclusion.

                    *         *         *

In sum, the putative error that petitioner has

51

identified is different in kind than the "significant error" that we remedied in *Edwards* by applying the doctrine of *nunc pro tunc*. Moreover, there is no allegation that the government engaged in misconduct or undue delay when resolving petitioner's motion to reopen. Petitioner's own delay in filing the motion was at least partially to blame for the fact that the Board did not resolve it before he was removed. Finally, the remand that petitioner seeks is exceedingly unlikely to result in the relief that he ultimately hopes to obtain. Therefore, under the circumstances of this case, we are not persuaded that principles of equity warrant *nunc pro tunc* relief.

## III.  CONCLUSION

For the foregoing reasons, the petition for review is denied.